**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Marcella Fox, | No. CV-23-00190-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| MHM Health Professionals LLC, | |
| Defendants. | |

Marcella Fox ("Plaintiff") has sued her former employer, MHM Health Professionals, LLC d/b/a Centurion Professionals ("Centurion"). In her operative pleading, the First Amended Complaint ("FAC"), Plaintiff asserts various claims against Centurion under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act ("ADA"). (Doc. 13.)

Now pending before the Court is Centurion's motion to dismiss. (Doc. 36.) For the reasons that follow, the motion is granted in part and denied in part.

## BACKGROUND

I.   Factual Allegations

A.   **The Parties**

At all relevant times, Plaintiff worked as a nurse at the Arizona State Prison Complex ("ASPC"). (Doc. 13 ¶ 2.) Plaintiff was employed by Centurion, which contracted with the Arizona Department of Corrections ("ADOC") to provide healthcare for inmates in the Arizona state prison system. (*Id.* ¶¶ 2, 4-5.) Through this arrangement,

Plaintiff worked closely with the ADOC and its employees.  (*Id.* ¶ 5.)

B. **The Sexual Assault**

In approximately mid-2019, an ADOC correctional officer named Jason McClelland ("McClelland") became flirtatious with Plaintiff.  (*Id.* ¶ 68.)  McClelland was a member of the elite Tactical Support Unit ("TSU"), a group "specially trained and generally held in high regard by their co-workers and prison staff."  (*Id.* ¶ 34.)  McClelland had a history of "making inappropriate sexual advances toward his female coworkers, including correctional officers as well as medical staff."  (*Id.* ¶¶ 26-65.)  He would "prey on young female corrections and medical staff members who he perceived to be vulnerable and easy to coerce."  (*Id.* ¶ 39.)

Between February 2019 and April 2020, McClelland "persistently harassed" a certified nursing assistant (*id.* ¶ 56), and between January 2019 and February 2020, he sexually assaulted two female corrections officers (*id.* ¶¶ 49, 51-52).  "Supervisory personnel" were aware of McClelland's conduct but did not reprimand him.  (*Id.* ¶¶ 27, 32, 54, 64.)  This was partly because "McClelland was popular, well liked, and respected among the command staff" and partly because of a "boys will be boys" culture that existed at the prison.  (*Id.* ¶ 40.)  "McClelland's victims did not always report his misconduct through formal channels" because they believed that the ADOC's "informal resolution" process was prone to manipulation and feared retaliation.  (*Id.* ¶¶ 44-47.)

After McClelland became interested in Plaintiff, his sexual advances "escalated in intensity over several months."  (*Id.* ¶ 69.)  He was "pushy and aggressive" with Plaintiff; would "find [her] during her shifts, follow her around, and come on to her;" and was often "wait[ing] for her by her car or near the front gate of Central Unit."  (*Id* ¶¶ 69-70, 72.)  "Plaintiff informed the supervising registered nurse and other co-workers that McClelland's advances made her uncomfortable; however, neither the supervising nurse nor other co-workers formally reported the harassment."  (*Id.* ¶ 71.)

On July 15, 2020, McClelland sexually assaulted Plaintiff.  (*Id.* ¶¶ 74-91.)  Plaintiff encountered McClelland while she was working the night shift at ASPC-Florence and

traveling between two separate units of the prison complex.  (*Id.* ¶¶ 74-75.)  McClelland asked her to accompany him to his car and she agreed.  (*Id.* ¶ 76.)  On the way, "McClelland asked Plaintiff if she had ever been inside the TSU Building.  When Plaintiff told him she had not, he took her to the TSU Building, unlocked the door with his key, and had her enter the building in front of him."  (*Id.* ¶ 77.)  Once inside, McClelland "grabbed Plaintiff by her arm and waist, pulled her to him, and began to kiss her."  (*Id.* ¶ 81.)  Plaintiff told him to stop and tried to pull away but could not escape.  (*Id.* ¶¶ 82-83.)  "With his arms around her waist, McClelland pushed Plaintiff across the room and against a wall."  (*Id.* ¶ 84.)  Holding her there, he "kissed her neck repeatedly, and tried to remove her shirt and pants," "then used his hand to rub Plaintiff's genitals over her clothing."  (*Id.* ¶¶ 85, 87).  Plaintiff repeatedly told McClelland "No" and "feared that [he] was going to rape her."  (*Id.* ¶¶ 88-89.)

Eventually, Plaintiff escaped from McClelland.  (*Id.* ¶ 90.)  She immediately went to her supervisor, Stephanie Oplinger ("Oplinger"), and, while "sobbing and visibly distressed," told her what had happened.  (*Id.* ¶¶ 90-91).  An internal investigation ensued and other women who had been harassed or assaulted by McClelland came forward.  (*Id.* ¶¶ 92-94).

On July 18, 2020, Plaintiff "reported the assault to the Florence Police Department." (*Id.* ¶ 95.)

On July 22, 2020, Plaintiff "sought and obtained an Injunction Against Harassment against McClelland" in Pinal County Superior Court.  (*Id.* ¶ 98.)

C.   **Immediate Aftermath**

Plaintiff took time off work following the assault and "received treatment for depression, anxiety, and post-traumatic stress disorder" ("PTSD").  (*Id.* ¶¶ 110-11.) Centurion was aware of her mental health diagnosis.  (*Id.* ¶ 112.)[1]  Meanwhile, McClelland

---

[1]   In her charge of discrimination to the Equal Employment Opportunity Commission ("EEOC")—which, as discussed in later portions of this order, is incorporated by reference in the FAC—Plaintiff elaborated that "Centurion was made aware of my mental health diagnoses because I made a workers' compensation claim for the injuries and medical treatment I incurred as a result of the July 2020 sexual assault."  (Doc. 36-1 at 90.)

continued working at ASPC-Florence but "was instructed that he could not work with inmates or work an armed position." (*Id.* ¶ 99.)  No other steps were taken to protect Plaintiff and other female staff.  (*Id.*)  And during that time, McClelland told a prison Lieutenant that "if 'these bitches' ruined his life, he would kill them."  (*Id.* ¶ 100.) "[N]either [the Lieutenant] nor any other supervisor admonished McClelland for making the threat or immediately reported and documented the threat" and it was only several months later that Plaintiff learned of the incident.  (*Id.* ¶¶ 101-02.)  McClelland was eventually transferred to a different prison complex.  (*Id.* ¶ 103.)

On August 6, 2020, McClelland was arrested.  (*Id.* ¶ 104.)

On August 11, 2020, McClelland voluntarily resigned.  (*Id.* ¶ 107.)  "Around the time of McClelland's arrest, ADOC personnel were sharing news articles about the incidents on social media."  (*Id.* ¶ 105.)  When Plaintiff returned to work, she "face[d] rumors and comments from co-workers, and she felt she was being blamed for McClelland's arrest."  (*Id.* ¶ 113.)

D.   **Transfer To ASPC-Phoenix**

"In approximately mid-November 2020, Plaintiff was transferred to ASPC-Phoenix."  (*Id.* ¶ 116.)  However, the rumors about her report of sexual harassment continued.  (*Id.* ¶ 117.)  "Among other things, corrections officer [sic] started a rumor that Plaintiff had made up the 'story of assault' because she had been caught allegedly trying to 'sleep' with an inmate."  (*Id.*)

In March 2021, Plaintiff was promoted to Director of Nursing.  (*Id.* ¶ 118.)

In April 2021, Plaintiff filed a lawsuit against the State of Arizona, McClelland, and three other ADOC employees (hereinafter, "*Fox I*").  (*Id.* ¶ 119.  *See also* Doc. 36-1 at 4-20.)  After filing *Fox I*, "Plaintiff faced increased harassment from co-workers employed by ADOC and Centurion at ASPC-Phoenix, which Plaintiff perceived as being in retaliation for her participation in the lawsuit and the criminal charges against McClelland, as well as because of her history of depression, anxiety, and PTSD."  (Doc. 13 ¶ 120.) Plaintiff found that "nursing staff were resistant to [her] leadership and made multiple

untrue complaints against her." (*Id.* ¶ 121). "ADOC's Lead Monitor Vanessa Headstream and Centurion Assistant Director of Nursing Allie Mardesich and Lab Technician Nicky Ziyadat ran a background check on Plaintiff and spread inaccurate information about her across the prison complex and to the Arizona State Board of Nursing, which put Plaintiff's nursing license in jeopardy." (*Id.* ¶ 122.)[2] "Ziyadat also found news articles about Plaintiff's sexual assault and circulated them amongst co-workers at ASPC-Phoenix." (*Id.* ¶ 123.) In the end, Ziyadat and Mardesich were either terminated or resigned from their positions. (*Id.* ¶ 125.)

Following Ziyadat's and Mardesich's departures, Plaintiff's perceived harassment continued to increase. (*Id.*) "ADOC Contact Monitors" began to target Plaintiff by "visiting ASPC-Phoenix and auditing items more frequently than before." (*Id.* ¶ 127.) Wendy Larson ("Larson"), Centurion's risk manager, also "targeted Plaintiff during daily regional phone calls and would intentionally list alleged deficiencies at the ASPC-Phoenix complex and not others." (*Id.* ¶ 128.) "Larson made allegations about Plaintiff and her performance to [an] ADOC [Contact] Monitor." (*Id.* ¶ 129.) And nursing staff began to "call off" of work "in retaliation against Plaintiff for Ziyadat's and Mardesich's separation from Centurion." (*Id.* ¶ 130.) When nursing staff called off, Plaintiff was forced to take on additional duties (*id.* ¶ 135), and understaffing exacerbated her other difficulties (*id.* ¶ 131).

In mid-2021, Plaintiff also began to experience harassment from Dr. Seth Stabinsky ("Dr. Stabinsky"), a Centurion medical provider. (*Id.* ¶ 132.) "On multiple occasions, Dr. Stabinsky yelled at Plaintiff, belittled her, and verbally threatened her licensure." (*Id.*)

"[I]n July 2021, Dr. Stabinsky used his body to block the door to prevent Plaintiff from leaving." (*Id.* ¶ 133.) Because of Plaintiff's PTSD and her experience with sexual assault, these incidents were "particularly distressing." (*Id.* ¶ 134.)

---

[2]    In her charge of discrimination to the EEOC, Plaintiff elaborated that "[t]hese co-workers learned that I had previously attempted suicide and was criminally charged after being pulled over while trying to drive myself to a hospital after the attempt." (Doc. 36-1 at 92.) Plaintiff added: "Mardesich told other co-workers that I have PTSD and was not suitable for the job." (*Id.*)

In September 2021, Plaintiff met with, *inter alia*, Centurion's Regional Director of Operations, Daniel Sego ("Sego").  (*Id.* ¶ 135.)  They discussed Plaintiff's concerns about understaffing and about nursing staff "resisting their job expectations."  (*Id.*)  They also discussed a plan "to prioritize all [ADOC] monitoring requests as well as those of [the] Risk Manager."  (*Id.* ¶ 136.)  This plan required Plaintiff "to undertake the enormous task of auditing an entire month of inmate movement" on top of her other job responsibilities.  (*Id.* ¶¶ 137-138.)  "This audit took time for Plaintiff to complete, and she was reprimanded daily for not having it completed . . . ."  (*Id.* ¶ 138.)  At the end of the month, Plaintiff received an informal call from Sego, who "asked how she was doing because he was aware of her mental health diagnoses and the ongoing harassment."  (*Id.* ¶ 139.)  During the phone call, "Plaintiff admitted that she was exhausted."  (*Id.*)  "The months of constant harassment and hostility had a profoundly negative affect on [her] mental health, and she began a leave of medical absence from her position."  (*Id.* ¶ 140.)

E.     **Plaintiff's Resignation**

After Plaintiff's phone call with Sego, rumors began to circulate that she was resigning as the Director of Nursing.  (*Id.* ¶ 141.)  "Plaintiff shortly thereafter learned that she was being demoted from Director of Nursing and was told her job had been 'posted' . . . ."  (*Id.* ¶ 142.)

In October 2021, while still on a leave of absence, Plaintiff learned that Centurion had hired Jeffery Van Winkle ("Van Winkle"), the former warden of ASPC-Florence, to be the new Assistant Facility Health Administrator for the ASPC-Phoenix complex.  (*Id.* ¶ 143.)  At that time, Van Winkle was a defendant in *Fox I* and "Sego was directly involved in [his] recruiting and hiring."  (*Id.* ¶ 144.)

In November 2021, Plaintiff resigned from Centurion.  (*Id.* ¶ 145.)

II.    Procedural History

A.     **Proceedings In *Fox I***

On April 26, 2021, Plaintiff filed a complaint in Maricopa County Superior Court styled *Fox v. State of Arizona, et al.*, No. CV2021-006796.  (Doc. 36-1 at 4-20.)  The

complaint named the State of Arizona, McClelland, Van Winkle, and two other ADOC supervisors as defendants and asserted state-law tort claims and claims arising under 42 U.S.C. § 1983. (*Id.*)

On June 23, 2021, McClelland filed a notice of removal based on federal-question jurisdiction and the resulting case was captioned *Fox v. State of Arizona, et al.*, No. 21-cv-01089-PHX-MTL (D. Ariz.). (Doc. 36-1 at 24.)

On July 16, 2021, Van Winkle and the other ADOC supervisors filed a motion to dismiss, arguing that Plaintiff had failed to state a claim and that they were entitled to qualified immunity. (*Fox I*, Dkt. 9.) (Doc. 36-1 at 25.)

On November 15, 2021, Arizona served Centurion with a document subpoena. (*Fox I*, Dkt. 27.)

On January 21, 2022, the court granted the motion to dismiss, finding that Plaintiff had failed to state a claim and dismissing Van Winkle and the other ADOC supervisors from the lawsuit. (*Fox I*, Dkt. 30.)

On February 4, 2022, Plaintiff filed an amended complaint, dropping the two ADOC supervisors as defendants and adding additional factual allegations against Van Winkle. (*Fox I*, Dkts. 32, 33.) The amended complaint converted Plaintiff's § 1983 "Ratification" claim against Van Winkle into an "Equal Protection" claim. (*Id.*)

On September 16, 2022, following discovery, Arizona filed a motion entitled "Motion to Dismiss or for Summary Judgment on Jurisdiction." (*Fox I*, Dkt. 70.)

On July 3, 2023, the court granted Arizona's motion, finding that Arizona was Plaintiff's "statutory employer." (*Fox I*, Dkt. 165.) (Doc. 36-1 at 62-78.) The court declined to exercise supplemental jurisdiction over Plaintiff's state-law claims and dismissed Arizona as a defendant. (*Id.*)

On September 13, 2023, Plaintiff moved for entry of judgment under Rule 54(b) as to Arizona. (*Fox I*, Dkt. 166.) (Doc. 36-1 at 80-85.)

On November 7, 2023, the court granted summary judgment in favor of the remaining defendants, finding that McClelland had not acted under color of state law and

1  that Van Winkle was entitled to qualified immunity.  (*Fox I*, Dkt. 177.)  The court then

2  entered judgment and dismissed the remaining defendants.  (*Fox I*, Dkt. 178.)

3       On November 16, 2023, Plaintiff filed a notice of appeal.  (*Fox I*, Dkt. 179.)

4       On March 1, 2024, the Ninth Circuit dismissed the appeal on Plaintiff's motion.

5  (*Fox I*, Dkt. 195.)

6       **B.**    **Proceedings Before The EEOC**

7       On or about October 28, 2021, while *Fox I* still pending, Plaintiff filed a charge of

8  discrimination with the EEOC alleging that Centurion had engaged in retaliation and

9  discrimination based on sex and disability.  (Doc. 13 ¶ 18; Doc. 36-1 at 87-96.)

10       On or about October 19, 2022, "[u]pon discovering that Defendant State of Arizona

11  considered her to be a statutory employee," Plaintiff filed a second charge of discrimination

12  against Arizona with the EEOC.  (Doc. 13 ¶ 16.)

13       On November 1, 2022, the EEOC issued Plaintiff a right-to-sue letter as to Arizona.

14  (*Id.*)

15       On September 20, 2023, the EEOC issued Plaintiff a right-to-sue letter as to

16  Centurion.  (*Id.* ¶ 18.)

17       **C.**    **Current Proceedings**

18       On January 30, 2023, within 90 days of receiving her first right-to-sue letter,

19  Plaintiff initiated the present action against Arizona.  (Doc. 1.)  In the original complaint,

20  Plaintiff asserted various claims against Arizona under Title VII and the ADA.  (*Id.* ¶¶ 140-

21  74.)

22       On October 12, 2023, within 90 days of receiving her second right-to-sue letter,

23  Plaintiff filed the FAC, adding Centurion as a defendant.  (Doc. 13.)  Plaintiff alleges that

24  Centurion (1) subjected her to a hostile work environment and discrimination based on her

25  sex and gender, in violation of Title VII; (2) retaliated against her for engaging in protected

26  activity, in violation of Title VII; (3) subjected her to disability discrimination and failed

27  to accommodate her disability, in violation of the ADA; (4) subjected her to a hostile work

28  environment, in violation of the ADA; and (5) retaliated against her for engaging in

protected activity, in violation of the ADA.  (*Id.* ¶¶ 147-85.)

On November 19, 2023, Arizona filed a motion to dismiss for failure to state a claim. (Doc. 22.)

On December 20, 2023, Centurion filed the pending motion to dismiss.  (Doc. 36.)

On March 5, 2024, Arizona filed a notice of settlement.  (Doc. 44.)

On March 25, 2024, pursuant to the parties' stipulation, the Court dismissed Arizona, leaving Centurion as the only remaining defendant.  (Docs. 45, 46.)

Centurion's motion to dismiss is now fully briefed and neither side requested oral argument.  (Docs. 39, 40.)

## DISCUSSION

### I.   Legal Standards

#### A.   **Motion To Dismiss**

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (cleaned up).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party."  *Id.* at 1444-45 (citation omitted).  However, the court need not accept legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678-80.  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.  The court also may dismiss due to "a lack of a cognizable legal theory."  *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

#### B.   **Consideration Of Documents Outside The Pleadings**

In its motion, Centurion asks the Court to take judicial notice of certain documents filed in *Fox I*.  (Doc. 36 at 2 n.3.)  Centurion also asks the Court to consider Plaintiff's

EEOC charge under the doctrine of "incorporation by reference." (*Id.* at 2 n.3, 8-9.)  It does not appear that Plaintiff opposes these requests.

"Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  For materials incorporated by reference, "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder*, 450 F.3d at 448.  A court may also "take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).  "[W]hen a court takes judicial notice of another court's opinion, it may do so 'not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'" *Id.* at 690 (citation omitted).

The Court agrees that the filings in *Fox I* and the other documents attached to Centurion's motion are properly before the Court at this juncture.  Neither party has disputed the authenticity of these documents, the FAC refers explicitly to the *Fox I* lawsuit and Plaintiff's EEOC charge, and the remaining documents are subject to judicial notice.

Plaintiff also attaches several documents to her response brief.  (Doc. 39-1.)  These documents are intended to establish the scope of the EEOC's investigation into Plaintiff's charge.  (Doc. 39 at 13.)  Centurion opposes Plaintiff's attempt to rely on these documents, arguing that because they "are not attached to nor referenced in the FAC," they "should be ignored for purposes of this Motion."  (Doc. 40 at 10.)  The parties' dispute over these documents is addressed in Part IV *infra*.

1  II.   Claim Preclusion

2        A.   **The Parties' Arguments**

3             Centurion argues that Plaintiff's claims are barred under the doctrine of claim

4  preclusion. (Doc. 36 at 4-8.) According to Centurion, Plaintiff's Title VII and ADA claims

5  arise "out of the same transactional nucleus of facts" as her claims in *Fox I* because both

6  sets of claims "stem from the [same] sexual assault," "repeat[] dozens of allegations," and

7  "involve the same evidence." (*Id.* at 4-5.) Centurion thus argues that there is an "identity

8  of claims" between *Fox I* and the present case and both cases should have been tried

9  together. (*Id.* at 6.) Centurion also argues that Plaintiff's Title VII and ADA claims "were

10 asserted, or could have been asserted, in a previous action" because Plaintiff filed her

11 complaint in *Fox I* after she "knew of the alleged retaliatory harassment" and then filed an

12 amended complaint in *Fox I* after she had resigned from her employment. (*Id.* at 4-5,

13 citation omitted.) Centurion contends that although Plaintiff had not yet received a right-

14 to-sue letter from the EEOC at the time of the *Fox I* litigation, this fact is immaterial

15 "because Plaintiff never sought a stay to obtain such notices or amend the complaint in her

16 earlier action after receiving them." (*Id.* at 6.) Centurion also argues that it shares privity

17 with Arizona for purposes of claim preclusion because although "Centurion was not a party

18 in the earlier action, Centurion and the State had a commonality of interest such that the

19 State adequately represented Centurion's interest in *Fox I*." (*Id.* at 6-8.) This commonality

20 of interest, according to Centurion, arose from a "close contractual relationship" between

21 Centurion and Arizona under which Arizona "maintained control and supervision of

22 Centurion's work" and Centurion became "part and process of the State's regular business

23 in maintaining prisons." (*Id.* at 6.) Because Plaintiff asserts her present claims "on the

24 theory that [Centurion and Arizona] are both her employer," Centurion argues that it would

25 be "inconsistent and unreasonable" to find there is no commonality of interest between the

26 defendants. (*Id.* at 8.)

27             In response, Plaintiff identifies several reasons why her claims are not barred by the

28 doctrine of claim preclusion. (Doc. 39 at 6-9.) First, Plaintiff argues that the two cases do

not involve "substantially the same evidence" because *Fox I* "was limited to evidence of the July 15, 2020 assault, the State's knowledge of McClelland's misconduct and disposition *before* the assault, and whether McClelland was acting in the course and scope of his employment when he committed the assault," whereas  this case will "involve different witnesses" and "concern[] events that occurred at a different prison complex many months *after* the conduct at issue in *Fox I*." (*Id.* at 7.)  In addition, Plaintiff argues that "the rights and interests established in *Fox I* will not be destroyed or impaired if this suit goes forward" because "the cases involve the infringement of different rights, namely, rights available under Arizona state law to an individual harmed by an employee of the State versus rights available under federal law to an employee who has experienced harassment, discrimination, and retaliation in response to engaging in protected activity." (*Id.* at 6-7.)  Plaintiff contends that she did not have the opportunity to pursue her hostile work environment claim in *Fox I* because "the conduct giving rise to that claim did not occur until after she initiated the [first] lawsuit" and that she could not have added her Title VII and ADA claims to *Fox I* when she filed her amended complaint in that case because the court only granted her limited leave to amend and the deadline to add claims and parties had passed. (*Id.* at 8 & n.3.)  In reliance on *Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc.*, 590 U.S. 405 (2020), Plaintiff argues that "claim preclusion 'does not bar claims that are predicated on events that postdate the filing of the initial complaint.'" (Doc. 39 at 8.)  Last, Plaintiff argues that Centurion is not in privity with any party in *Fox I* for purposes of claim preclusion. (*Id.* at 9-10.)  Plaintiff asserts that the contractual relationship between Arizona and Centurion "does not establish privity in relation to the claims Plaintiff asserted in *Fox I*, nor does the existence of the contract show that the State adequately represented Centurion's interests." (*Id.* at 9.)  Plaintiff also contends that both lawsuits "do not relate to [Plaintiff's] employment with Centurion," because *Fox I* turned on Arizona's vicarious liability for McClelland's actions while this action turns on Centurion's subsequent maintenance of a hostile work environment, retaliation, and ADA violations. (*Id.* at 7-8.)

In reply, Centurion reiterates that Plaintiff's present claims share a common nucleus of facts with *Fox I*. (Doc. 40 at 2-3.) Centurion argues that claims arising from the same course of employment ordinarily share a common nucleus of operative facts and accuses Plaintiff of downplaying the significance of the sexual assault, which was a central feature of *Fox I*. (*Id.* at 3-4.) Centurion also reiterates that Plaintiff could have added her ADA and Title VII claims to *Fox I* because she "was undoubtedly aware of the alleged sexual discrimination and retaliation at the time she filed *Fox I*." (*Id.* at 4.) If additional harassment and discrimination occurred later, Centurion argues that "[those] acts of alleged harassment or retaliation are related to the [original] harassment and, therefore part of the same transaction." (*Id.*) Although Centurion concedes that "claim preclusion does not apply to claims that accrue after the filing of the operative complaint," it argues that, unlike the initial complaint in *Lucky Brand Dungarees,* the "operative complaint" in *Fox I* was the amended complaint. (*Id.* at 4-5.) Centurion also argues that the court in *Fox I* did not limit Plaintiff's ability to amend her complaint, so she could have added the additional claims being pursued here. (*Id.* at 5.) These additional claims, according to Centurion, involve the infringement of the same rights as *Fox I* and threaten to disturb the rights and interests established in *Fox I*. (*Id.* at 7.) Centurion argues that even though Plaintiff brings the present action under a different label, "[b]oth actions involve Plaintiff's rights to be free from alleged harassment, discrimination, and retaliation in the workplace" and that the present action will "necessarily force the parties to relitigate whether Centurion and the State are Plaintiff's joint employers" because Plaintiff seeks "compensation for the same alleged sexual assault." (*Id.* at 6-7.) Centurion also contends that privity is established by more than the existence of a contract. (*Id.* at 7-8.) According to Centurion, Arizona's non-delegable duty to provide healthcare to inmates created a "long-term interconnected relationship . . . as it pertained to Centurion's employees" under which Arizona "exercise[d] substantial supervision and control over [Centurion's] employees." (*Id.*) The nature of this relationship, Centurion argues, is particularly pertinent here because "Centurion and the State's relationship was central to Plaintiff's claims in *Fox I*" and "an

1    adverse ruling in *Fox I* would have bound Centurion as it relates to the alleged workplace
2    sexual assault upon which Plaintiff's discrimination, hostile work environment, and
3    retaliation claims in this action are based." (*Id.* at 8.)

4         B.    **Analysis**

5         "Res judicata, also known as claim preclusion, bars litigation in a subsequent action
6    of any claims that were raised or could have been raised in the prior action." *W. Radio*
7    *Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997). "[F]or res judicata to apply
8    there must be: 1) an identity of claims, 2) a final judgment on the merits, and 3) identity or
9    privity between parties." *Id.* The party seeking preclusion has the burden of establishing
10   the necessary elements. *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1021
11   (9th Cir. 2019). The Court applies "the res judicata rule of the jurisdiction that heard the
12   initial case." *Howard v. City of Coos Bay*, 871 F.3d 1032, 1040 n.2 (9th Cir. 2017). Thus,
13   federal law applies here. *Media Rights Techs., Inc.*, 922 F.3d at 1021 n.6 ("Because the
14   decision to be given preclusive effect was rendered by a federal court exercising federal-
15   question jurisdiction, federal common law determines whether preclusion applies.").

16        The parties agree that *Fox I* reached a final judgment on the merits but dispute
17   whether the first and third elements of the claim-preclusion test are satisfied. Because the
18   Court concludes that Centurion has not met its burden as to the identity-or-privity-between-
19   parties criterion, it is unnecessary to decide whether an identity of claims exists.

20        "Generally speaking, the pursuit of a claim against one individual will not bar the
21   pursuit of the same claim against another." *FTC v. Garvey*, 383 F.3d 891, 898 n.6 (9th Cir.
22   2004). However, an exception exists when parties and nonparties are in "privity"—that is,
23   when "a person [is] so identified in interest with a party to former litigation that he
24   represents precisely the same right in respect to the subject matter involved." *United States*
25   *v. Schimmels*, 127 F.3d 875, 881 (9th Cir.1997) (internal quotation marks omitted). To
26   some extent, "privity is a flexible concept dependent on the particular relationship between
27   the parties in each individual set of cases." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l*
28   *Plan. Agency*, 322 F.3d 1064, 1081-82 (9th Cir. 2003). With that said, the Supreme Court

has rejected a broad theory of privity based on "virtual representation" where, through a "heavily fact-driven and equitable inquiry," the relationship between a party and a non-party is deemed "close enough to bring the second litigant within the judgment." *Taylor v. Sturgell*, 553 U.S. 880, 896, 898 (2008) (cleaned up).

In *Taylor*, the Supreme Court exhorted lower courts to follow "recognized exceptions" and "established grounds" when evaluating claims of nonparty preclusion. *Id.* at 893, 904. The Ninth Circuit has followed *Taylor*'s lead. *United States v. Bhatia*, 545 F.3d 757, 758 (9th Cir. 2008) ("[Defendant's] argument is a variation on the 'virtual representation' theory recently rejected by the Supreme Court in *Taylor* . . . . [H]is claims of res judicata and collateral estoppel are not colorable . . . .") (citation omitted). It has recognized that *Taylor* rejected an "expansive conception of the 'same party' requirement," *Mendoza v. Amalgamated Transit Union Int'l*, 30 F.4th 879, 886 n.3 (9th Cir. 2022), and continues to look to *Taylor* for guidance when facing novel situations that give rise to claims of privity. *See, e.g.*, *Bhatia*, 545 F.3d at 759; *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 996 (9th Cir. 2012).[3]

Among the recognized exceptions identified in *Taylor* that are potentially relevant here, the Ninth Circuit has acknowledged that nonparty preclusion may be justified (1) when a "nonparty was adequately represented by someone with the same interests who was a party to the first suit," *Mendoza*, 30 F.4th 887 (cleaned up), and/or (2) "based on a variety of pre-existing substantive legal relationships." *Milton H. Greene Archives*, 692 F.3d at 998 (cleaned up).[4]

---

[3]     Although *Mendoza* dealt with claim-splitting and *Milton H. Greene Archives* dealt with judicial estoppel, the standards for finding "privity" in these cases are closely related to the standard for finding privity in cases involving claim preclusion. *Mendoza*, 30 F.4th at 887 ("[A] nonparty to a first action may nonetheless be subject to *claim preclusion*— and therefore also to the bar against claim-splitting . . . .") (emphasis added); *Milton H. Greene Archives*, 692 F.3d at 997-98 (citing *Taylor* to establish the rule for "nonparty prelusion" in cases involving judicial estoppel).

[4]     *Taylor* identified four other "recognized exceptions" to the rule against nonparty preclusion: (1) when a nonparty agrees to be bound by the court's judgment in the original action; (2) when a nonparty has assumed control over litigation in the original action; (3) when a party attempts to avoid preclusion by relitigating through a proxy; and (4) when a special statutory scheme "expressly forclose[s] successive litigation by nonlitigants" consistent with due process. *Taylor*, 553 U.S. at 893-95.

1.   <u>Adequate Representation By Party With The Same Interests</u>

Centurion argues that "Centurion and the State had a commonality of interest such that the State adequately represented Centurion's interest in *Fox I*." (Doc. 36 at 7.) As explained below, this argument is unavailing.

"[A] nonparty is adequately represented in a prior suit when, at a minimum: (1) the interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Mendoza*, 30 F.4th at 887-88 (cleaned up). Even if these criteria are satisfied, "a conflict of interest between a non-party and his purported representative forecloses the possibility of privity because a nonparty cannot be adequately represented by a person with whom he is in conflict." *Kourtis v. Cameron*, 419 F.3d 989, 997 (9th Cir. 2005), *overruled on other grounds by Taylor*, 553 U.S. at 904. When adequate representation requires a "fact-intensive inquiry," it is "best determined outside the confines of a Rule 12(b)(6) motion." *GP Vincent II v. Est. of Beard*, 68 F.4th 508, 518 (9th Cir. 2023).

In *Mendoza*, a national union imposed a trusteeship over a local union after discovering financial malfeasance by the local union's then-president, Jose Mendoza. 30 F.4th at 883. The trusteeship resulted in the ouster of "Mendoza and the other Local 1637 members from office." *Id.* Mendoza then filed a single-plaintiff action ("*Mendoza I*") against the national union. *Id.* While that action was pending, Mendoza filed a separate multi-plaintiff action ("*Mendoza II*") joined by a majority of the other former executive board members, who asserted related claims. *Id.* The Ninth Circuit found that the local union board members shared a common interest with Mendoza because "all of the relevant claims and injuries in *Mendoza II* arose from the trusteeship that was challenged in *Mendoza I*" and the parties' claim for relief "rested dispositively, if not exclusively, on misconduct committed by Mendoza." *Id.* at 888. This congruence assured that the parties' interests in *Mendoza I* and *Mendoza II* were aligned:

> [B]ecause the trusteeship was imposed as a result of Mendoza's malfeasance, as opposed to any wholly independent conduct by other individual Plaintiffs, the Executive Board Plaintiffs' claims necessarily rise and fall with Mendoza's claims—further confirming that their interests are aligned. Indeed, on every cause of action the Executive Board Plaintiffs allege, they are joined together with Mendoza and they seek relief on identical grounds.

*Id.* As a result, the Ninth Circuit barred the former board members' claims in *Mendoza II*. *Id.* at 889.

Centurion has not established on this record that its interests are aligned with Arizona's interests in the same way. It's true that Centurion contracted with Arizona to provide healthcare services and that Plaintiff worked closely with ADOC Staff. (Doc. 13 ¶¶ 4-5.) And it may also be true that Arizona "maintained control and supervision of Centurion's work" and Centurion became "part and process of the State's regular business in maintaining prisons." (Doc. 36 at 7.) But this at most establishes that Arizona and Centurion had a common interest in the day-to-day operations of the prison and the maintenance of staff. It does not follow that Centurion and Arizona had a common interest in denying Plaintiff's recovery in *Fox I* or that Centurion's defense in this case will "rise and fall" alongside Arizona's. Unlike the nonparty board members in *Mendoza I*, Centurion's position does not depend on the conduct of its supposed "representative." In *Fox I*, Plaintiff claimed that Arizona was liable for its failure to supervise ADOC corrections staff and vicariously liable for the actions of McClelland, an ADOC employee. In this action, Centurion faces liability for its own conduct—its alleged maintenance of a hostile work environment, its alleged failure to accommodate Plaintiff's disability, its alleged retaliatory conduct, and its other independent conduct that allegedly facilitated Plaintiff's injuries. It is also notable that Arizona has already settled with Plaintiff in this action. Whatever the reasons for that settlement, it seems that Centurion's position in this action is independent of Arizona's.

Although Centurion's failure to establish the aligned-interests requirement is dispositive, Centurion has also failed to establish the second requirement for "adequate

representation," which is that "the party [in the first action] understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Mendoza*, 30 F.4th at 887-88. Centurion has not established on this record that Arizona understood itself to be representing Centurion in *Fox I* or that the court in *Fox I* took any steps to protect Centurion's interests. Centurion's name only appeared in passing during *Fox I*. It appeared first in Plaintiff's complaint, which simply alleged: "Plaintiff, at all relevant times, . . . was employed by the prison's healthcare contractor, Centurion." (*Fox I*, Dkt. 1-4 ¶ 2.) Centurion's name then came up during discovery, when Arizona served it with a document subpoena. (*Fox I*, Dkt. 27.) There is no evidence that the parties in *Fox I* ever suggested that Centurion should be joined as a necessary or indispensable party. Nor is there any suggestion that Arizona argued during *Fox I* that its defenses would also protect Centurion. In contrast, "[i]n *Mendoza I*, Mendoza specifically requested that, *inter alia*, the court declare that the trusteeship and the removal of Mendoza and [the executive board plaintiffs] was unlawful." *Mendoza*, 30 F.4th at 889. Mendoza also stated during the *Mendoza I* proceedings that he filed that action "on behalf of" the local union, and "all of the Executive Board Plaintiffs themselves submitted declarations in support of Mendoza's effort to get them restored to their positions." *Id.* Nothing comparable happened in *Fox I*. *See also Irwin v. Mascott*, 370 F.3d 924, 930-31 (9th Cir. 2004) (concluding that nonparty was bound by judgment in earlier action in part because he was "intimately involved in [the prior] litigation in that he submitted several key declarations and sat for two depositions").[5]

## 2.   Preexisting Substantive Legal Relationship

In the portion of its motion papers addressing privity, Centurion emphasizes that "the State contracted with Centurion to provide healthcare services to inmates" (Doc. 36 at 7) and that "Centurion and the State had a long-term interconnected relationship as it

---

[5]      The Court does not foreclose the possibility that Centurion may have been involved in *Fox I* in a more substantial manner than the current record suggests. But even if Centurion possesses additional evidence bearing on that issue, the question of adequate representation is still "best determined outside the confines of a Rule 12(b)(6) motion." *GP Vincent II*, 68 F.4th at 518.

pertained to Centurion's employees" (Doc. 40 at 8).  To the extent these assertions were meant to suggest that Centurion can establish privity under the "preexisting substantive legal relationship" doctrine,[6] that argument is unavailing.

Nonparty preclusion "may be justified based on a variety of pre-existing substantive legal relationships between the person to be bound and a party to the judgment." *Taylor,* 553 U.S. at 894 (cleaned up).  "Qualifying legal relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Id.*  The Ninth Circuit has also recognized privity among "survival claimants"; "joint obligees"; "parties to a contract, and in some cases promisees and third-party beneficiaries; indemnitors and indemnitees; corporations and their officers or shareholders; partners and their partnerships; and unincorporated associations and their members." *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1053 (9th Cir. 2005).  *See also Citcon USA, LLC v. MaplePay Inc.*, 2021 WL 1238231, *13 (N.D. Cal. 2021) ("[T]he *Taylor* Court left untouched the scope of *other* substantive legal relationships that pre-*Taylor* courts found gave rise to privity.").  The Ninth Circuit has recognized privity in some cases involving principal/agent and employer/employee relationships.  *Adams v. Cal. Dep't of Health Servs.*, 487 F.3d 684, 691 (9th Cir. 2007); *Spector v. El Ranco, Inc.*, 263 F.2d 143, 144-45 (9th Cir. 1959).  However, a finding of privity is not required in those circumstances.

As a preliminary matter, the parties' relationship in this case does not resemble any of the substantive legal relationships that the Supreme Court enumerated in *Taylor*.  Centurion and Arizona are not "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Taylor,* 553 U.S. at 894.  Nor do they share any of the other "limited number of legal relationships in which two parties have identical or transferred rights." *Headwaters Inc.*, 399 F.3d at 1053.  Although Centurion emphasizes

---

[6]     Centurion's briefing is not entirely clear on this point, as Centurion clarifies in its reply brief that "[c]ontrary to Plaintiff's argument, Centurion is not relying only on its contract with the State to establish privity, but on the entirety of the relationship as it pertains to Plaintiff's claims in *Fox I*." (Doc. 40 at 7.)

that "Plaintiff asserts all her claims against both Centurion and the State on the theory that they are both her employer" (Doc. 40 at 8), the proper inquiry focuses on the relationship *between* the defendants. The relationship between Arizona and Centurion is contractual, so it is at most akin to that of principal/agent or employer/employee. Although the Ninth Circuit in *Headwaters* stated that "parties to a contract" may share privity, this statement only refers to limited instances in which the parties' contractual rights are at issue. 399 F.3d at 1053 (citing Restatement (Second) of Judgments §§ 43-61 (1982)). There is no indication on this record that Centurion's contract with Arizona was at issue in *Fox I* or that the parties share any of the other relationships that traditionally give rise to privity.

The agency relationship between Centurion and Arizona is also inadequate to establish privity. To the extent the Ninth Circuit has recognized privity based solely on agency, its holdings were grounded in the now-defunct theory of "virtual representation." In *Adams*, for example, the plaintiff sued the California Department of Health Services ("CDHS") after CDHS rescinded her conditional employment offer. 487 F.3d at 686-87. After the plaintiff missed the deadline to file an amended complaint, she filed a second lawsuit including five additional defendants: three CDHS employees and two non-employee agents. *Id.* at 687, 691. The Ninth Circuit found that the new defendants were in privity with CDHS because it had "virtually represented" them in the prior lawsuit and they maintained a "close relationship" with CDHS. *Id.* at 691-92. However, the Ninth Circuit has since recognized that "*Adams*'s expansive conception of the 'same party' requirement was rejected by the Supreme Court." *Mendoza*, 30 F.4th at 886 n.3. Thus, even if Centurion's relationship with Arizona is analogous in some ways to CDHS's relationship with the employees and agents at issue in *Adams*, that relationship is still insufficient to establish privity post-*Taylor*.

Other cases recognizing privity based on employment and agency relationships are also distinguishable. In *Spector*, the Ninth Circuit found that a judgment in favor of a hotel barred the original plaintiff from later seeking recovery from the hotel's employee. 263 F.2d at 144-45. As the court explained, "[w]here, as here, the relations between two parties

- 20 -

are analogous to that of principal and agent, the rule is that a judgment in favor of either, in an action brought by a third party, rendered upon a ground equally applicable to both, is to be accepted as conclusive against the plaintiff's right of action against the other." *Id.* at 145 (citation omitted).  Although this statement might, at first blush, suggest that agents and principals always share privity, the parties' relationship in *Spector* was notably different from the relationship between Arizona and Centurion.  Unlike the hotel in *Spector*, Arizona was not vicariously liable for its agent's (Centurion's) conduct in the original action.  Rather, Arizona was vicariously liable for the conduct of two ADOC employees based on a wholly separate agency relationship.

The lack of a "vicarious liability relationship" between Centurion and Arizona in the first action is significant.  *See, e.g.*, *Sacks v. Texas S. Univ.*, 83 F.4th 340, 346 (5th Cir. 2023) ("A vicarious liability relationship between an employer and employee can create the requisite privity."); *Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1288-89 (5th Cir. 1989) (citing *Spector* and concluding the same); *Lober v. Moore*, 417 F.2d 714, 718 (D.C. Cir. 1969) ("[I]t is the prevailing rule in the federal and the state courts that a judgment excusing the master or principal from liability on the ground that the servant or agent was not at fault forecloses a subsequent suit against the latter on the same claim.") (collecting cases).  Without vicarious liability, there is no guarantee that Centurion and Arizona shared aligned interests or that Arizona adequately represented Centurion's interests in the preceding litigation.  *See also* 18A C. Wright & A. Miller, *Federal Practice and Procedure, Jurisprudence and Related Matters* § 4460 (3d ed.) ("Without more, litigation by an employer is not binding on employees, nor is litigation by employees binding on their employer.").

Perhaps anticipating these concerns, Centurion argues that "an adverse ruling in *Fox I* would have bound Centurion as it relates to the alleged workplace sexual assault upon which Plaintiff's discrimination, hostile work environment, and retaliation claims in this action are based." (Doc. 40 at 8.)  But this assertion is conclusory and circular.  Centurion would only be bound by the judgment in *Fox I* if Centurion and Arizona were in privity.

The same is true for any of the specific issues determined in *Fox I*, including the issue of Plaintiff's sexual assault.  Under the parallel doctrine of issue preclusion, "preclusion is appropriate only if . . . the party against whom issue preclusion is asserted was a party or in privity with a party to the prior action."  *Syverson v. Int'l Bus. Machines Corp.*, 472 F.3d 1072, 1078 (9th Cir. 2007).

III.    Timeliness Of Sex Discrimination Claim

      A.    **The Parties' Arguments**

In Count One of the FAC, Plaintiff asserts a claim for "Sex Discrimination; Hostile Work Environment" in violation of Title VII.  (Doc. 13 ¶¶ 147-55.)  Centurion identifies two reasons why this claim should be deemed time-barred.  (Doc. 36 at 8-9.)  First, Centurion argues that the alleged sexual assault by McClelland on July 15, 2020 "constitutes a single occurrence and, thus, a discrete act" and that Count One is therefore untimely because an employee seeking to recover under Title VII must "file a charge within 300 days of the alleged unlawful employment action" but Plaintiff did not file her EEOC charge until October 28, 2021.  (*Id.* at 8.)  Second, Centurion argues that although "[i]t is true that hostile work environment claims are not time-barred as long as at least one act of harassment falls within the statutory period," Count One would be untimely even if conceptualized as a unitary hostile work environment claim because "Plaintiff's allegations of harassment based on sex all predate her transfer to ASPC-Phoenix in November 2020"— which occurred more than 300 days before Plaintiff filed her EEOC charge—and all of the subsequent, post-transfer harassment alleged in the FAC was motivated by retaliatory animus, "not based on sex or gender." (*Id.* at 8-9.)

In response, Plaintiff argues that Count One is not time-barred.  (Doc. 39 at 10-12.) Plaintiff contends that Count One is not based on the "discrete act" of McClelland's sexual assault but rather is based on "a continuous series of events."  (*Id.* at 11.)  Plaintiff also disputes that the sex-based harassment ended upon her transfer to ASPC-Phoenix, arguing that "the FAC alleges that Plaintiff endured rumors and harassment of a sexual nature *after* her transfer . . . .  If any of this conduct occurred on or after January 1, 2021, then Plaintiff's

charge . . . is timely with respect to her Title VII hostile work environment claim." (*Id.* at 11-12.)

In reply, Centurion reiterates that Plaintiff's alleged sexual assault must be treated as a "discrete act with its own limitations period." (Doc. 40 at 9.)  According to Centurion, a contrary position is "inconsistent" with Plaintiff's other arguments because "it means the facts underlying Plaintiff's hostile work environment claim pre-dated the assault and should have been asserted in *Fox I* for purposes of claim preclusion." (*Id.* at 8-9.) Centurion further argues that "discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges" and that "Plaintiff cannot genuinely dispute that she perceived the alleged sexual assault as independently actionable given that she initiated a lawsuit and criminal proceedings based on this event." (*Id.* at 9, cleaned up.)  According to Centurion, the only allegation of sexual harassment that Plaintiff asserts within the statutory period "does not pertain to any Centurion employee and Plaintiff does not allege that any of this conduct actually took place after January 1, 2021." (*Id.* at 9-10.)

B.    **Analysis**

1.    Sexual Assault As A "Discrete Discriminatory Act"

"Hostile environment claims are different in kind from discrete acts." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).  In *Morgan*, the Supreme Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113.  These acts include "termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114.  "In contrast to discrete acts . . . claims based on a hostile environment will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Cherosky v. Henderson,* 330 F.3d 1243, 1246 (9th Cir. 2003) (cleaned up).

Centurion's first dismissal argument is that "Plaintiff's sex discrimination claim is

time barred" because it is based on the alleged sexual assault by McClelland, which qualifies as a "discrete discriminatory act" yet occurred more than 300 days before Plaintiff filed her EEOC charge.  (Doc. 36 at 8.)  This argument fails for a pair of independent reasons.

First, even assuming the alleged assault by McClelland must be treated as a "discrete discriminatory act," Centurion does not explain why that determination would require the outright dismissal of Count One.  Plaintiff is the master of her complaint and has chosen to plead Count One as a hostile work environment claim in which the assault by McClelland in July 2020 simply forms one component of the challenged employment practice, which stretched from 2019 into 2021.  *Morgan*, 536 U.S. at 122 ("A charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."); *Porter v. California Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005) ("*Morgan* does not call for the most egregious of the harassing events to occur within the 300-day period, nor does it demand that the harassing conduct continue to escalate over time in order for a hostile-environment claim to be actionable.").  Thus, even if the alleged assault by McClelland were excised from the FAC, Count One would still state a claim for hostile work environment.

Second, Centurion's timeliness arguments related to the assault also fail on the merits.  *Morgan* was not concerned with "discrete acts" in a literal sense but with "discrete *discriminatory* acts," akin to "retaliatory adverse employment decision[s]," that are actionable under Title VII.  536 U.S. at 113-14 (emphasis added).  Such acts include "termination, failure to promote, denial of transfer, or refusal to hire."  *Id.* at 114.  The Ninth Circuit has distinguished such "discrete acts" from "non-discrete acts" of harassment.  *Porter*, 419 F.3d at 893 ("[T]he bulk of the conduct attributed by Porter to the CDC and its agents falls into the category of discrete acts; for instance, refusing to grant Porter's requests for vacation or holidays, requiring Porter to be tested for tuberculosis by her own physician, threatening disciplinary action while she was on medical leave, leaving

a negative performance evaluation in her personnel file, and instructing her to enter the work site through the back gate.  That leaves the following allegations of non-discrete acts: Wheeler and DeSantis sexually propositioned Porter and made offensive comments to her or about her in 1995 and 1996; Wheeler ate and then spat in Porter's food in 1996 or 1997; Wheeler referred to her as a 'fucking bitch' when she showed up on his yard in 1998; DeSantis told another correctional officer that Porter was a 'whore' in 1996 and glared at her during the investigation that commenced in October 1998; Ford made angry remarks to her in 1998; and unnamed officers began yelling insults and obscenities at her when she demanded to see their identification in 2001.").

Nevertheless, even assuming Centurion is correct that a single act of harassment, untethered to any adverse employment action, may qualify as "independently actionable" for purposes of the 300-day requirement, the sexual assault at issue here does not qualify as "independently actionable" when the factual allegations in the FAC are construed in the light most favorable to Plaintiff.  Although "[a] single incident of harassment can support a claim of hostile work environment . . . for a single incident to suffice, it must be extremely severe."  *Fried v. Wynn Las Vegas*, LLC, 18 F.4th 643, 648 (9th Cir. 2021) (cleaned up). For example, in *Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000), the Ninth Circuit found that a single instance of harassment was not sufficiently severe to establish a hostile work environment claim when the defendant "placed his hand on [Plaintiff's] stomach and commented on its softness and sexiness," then, after being asked to stop, "positioned himself behind [Plaintiff's] chair, boxing her in against the communications console . . . forcing his hand underneath her sweater and bra to fondle her bare breast."  *Id.* at 921.  These facts are analogous to the alleged sexual assault here.  After leading Plaintiff into the TSU Building, McClelland "grabbed Plaintiff by her arm and waist, pulled her to him, and began kissing her."  (Doc. 13 ¶ 81.)  After Plaintiff told him to stop, "[he] pushed Plaintiff across the room and against a wall . . . kissed her neck repeatedly and tried to remove her shirt and pants . . . tried to remove her clothing . . . then used his hand to rub Plaintiff's genitals over her clothing."  (*Id.* ¶¶ 81-97.)  Although the incident described in

the FAC is highly reprehensible and may go beyond the sexual assault described in *Brooks*, the type of sexual harassment the Ninth Circuit has characterized as "independently actionable" still requires much more.  *See, e.g.*, *Brooks*, 229 F.3d at 926 (describing an incident where the assailant "slapped [plaintiff], tore off her shirt, beat her, hit her on the head with a radio, choked her with a phone cord and ultimately forced her to have sex with him") (citing *Al-Dabbagh v. Greenpeace, Inc.*, 873 F. Supp. 1105, 1108 (N.D. Ill. 1994)); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 964, 966 (9th Cir. 2002) (describing how a plaintiff was drugged and repeatedly raped by her employer's client at a business meeting).

Centurion's real argument seems to be that the alleged assault cannot possibly be part of "the same unlawful employment practice" as the other alleged conduct that gives rise to Plaintiff's hostile work environment claim.  If so, Plaintiff might be precluded from basing her hostile work environment claim on the assault.  *See, e.g.*, *Morgan*, 536 U.S. at 120 ("A court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period."); *Porter*, 419 F.3d at 893 ("[T]o determine whether all of these events constitute 'one unlawful employment practice,' we consider whether they were sufficiently severe or pervasive, and whether the earlier and later events amounted to the same type of employment actions, occurred relatively frequently, or were perpetrated by the same managers.") (cleaned up); *Maliniak v. City of Tucson*, 607 F. App'x 626, 628 (9th Cir. 2015) ("Construing the evidence in the light most favorable to Maliniak, it was not unreasonable for a jury to conclude that the truck sign incident was related to the earlier bathroom incidents, and that all incidents were therefore part of the same actionable hostile work environment claim.").  However, Centurion has not developed this argument in any detail and the Court concludes it is ill-suited for resolution at the motion-to-dismiss stage, because deciding whether the other instances of harassment were part of "the same unlawful employment practice" as the assault would require a fact-intensive inquiry.

2.    Timeliness Of Hostile Work Environment Claim

This leaves Centurion's other argument, which is that Count One is untimely even if conceptualized as a single hostile work environment claim because all of the alleged sex-based discrimination ended in November 2020, upon Plaintiff's transfer to ASPC-Phoenix, which was more than 300 days before Plaintiff filed her EEOC charge.  (Doc. 36 at 9.)

As Centurion correctly notes, "Title VII requires that a plaintiff timely file charges of discrimination with the EEOC and receive a right to sue letter from the EEOC prior to bringing a Title VII claim in federal court." *Taxey v. Maricopa Cty.*, 237 F. Supp. 2d 1109, 1113 (D. Ariz. 2002).  Such a charge is timely if made "by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).  As discussed above, a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Morgan*, 536 U.S. at 122.

Here, Plaintiff filed a charge with the EEOC on October 28, 2021, alleging that Centurion had engaged in sex discrimination and created a hostile working environment.  (Doc. 13 ¶ 18; Doc. 36-1 at 87.)  For that charge to be timely, Plaintiff's hostile work environment claim must be premised on at least one act of sex-based discrimination that took place on or after January 1, 2021 (*i.e.*, 300 days before she filed the charge).

In her response brief, Plaintiff only identifies one paragraph in the FAC as supplying the necessary allegations on this point—paragraph 117.  (Doc. 39 at 12.)  It provides: "Corrections staff at ASPC-Phoenix also spread rumors about Plaintiff and her report of sexual harassment.  Among other things, corrections officer [sic] stated a rumor that Plaintiff had made up the 'story of assault' because she had been caught allegedly trying to 'sleep' with an inmate."  (Doc. 13 ¶ 117.)   The Court agrees with Centurion that paragraph 117 is insufficient to cure the timeliness issue.  The most glaring problem is that paragraph 117 does not specify *when* the alleged harassment took place.  Thus, it fails to plausibly establish that a portion of the alleged sex discrimination took place during the

relevant statutory period.  Separately, paragraph 117's vague attribution of the misconduct to "Corrections staff at ASPC-Phoenix" fails to plausibly establish that Centurion and its employees were responsible for the harassment.

Accordingly, Plaintiff's claim against Centurion in Count One is dismissed.

IV.   Exhaustion Of Administrative Remedies

A.   **The Parties' Arguments**

In the factual allegations underlying Count Two (Title VII retaliation) and Count Five (ADA retaliation), Plaintiff includes an allegation that "she was ultimately . . . constructively discharged." (Doc. 13 ¶¶ 159, 182.)  Centurion argues that Plaintiff did not exhaust her available administrative remedies as to any claim for constructive discharge. (Doc. 36 at 9-10.)  According to Centurion, Plaintiff filed her charge of discrimination with the EEOC a month before she resigned, the charge "did not mention her resignation or otherwise advance a constructive discharge theory," and Plaintiff did not subsequently amend her charge to add allegations related to her resignation.  (*Id.* at 10.)

In response, Plaintiff first argues that she did, in fact, supplement her original charge in a November 2021 letter to the EEOC and that a constructive discharge claim "could reasonably be expected to grow out of [her] original charge and the November 8, 2021 letter." (Doc. 39 at 13, cleaned up.)  Second, Plaintiff argues that her constructive discharge "fell within the scope of the EEOC's actual investigation," as evidenced by the fact that Centurion argued against constructive discharge in its position statement.  (*Id.*, citation omitted.)  Third, Plaintiff argues that Centurion and the EEOC had notice of Plaintiff's resignation and "understood the nature of [her] allegations" consistent with "the purposes of the administrative charge requirement."  (*Id.* at 13-14.)

In reply, Centurion argues that constructive discharge must be pleaded as a separate claim and cannot be tacked onto Plaintiff's other retaliation claims.  (Doc 40 at 10.)  In addition, Centurion argues that "[c]ourts have found a failure to exhaust constructive discharge claims under similar circumstances."  (*Id.*)  Centurion also asks the Court to ignore the additional documents cited by Plaintiff because they "are not attached to nor

referenced in the FAC." (*Id.*)  Alternatively, Centurion argues those documents are irrelevant because they only "suggest that the EEOC was somehow aware of [Plaintiff's] resignation, not that she was compelled to resign based on objectively intolerable working conditions." (*Id.*)

B.    **Analysis**

There is a strong argument that Centurion's exhaustion-related arguments are premature.  Before 2019, the Ninth Circuit characterized Title VII's administrative exhaustion requirement as "jurisdictional" in nature. *See, e.g.*, *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1099 (9th Cir. 2002) ("In order to establish subject matter jurisdiction over her Title VII claim, Plaintiff was required to exhaust her administrative remedies.").  Thus, before 2019, it was permissible in the Ninth Circuit to seek dismissal of a Title VII claim based on a lack of exhaustion pursuant to a Rule 12(b)(1) motion to dismiss, and both sides could submit materials outside the pleadings in an effort to establish exhaustion (or a lack thereof).  *See, e.g.*, *Bill v. Berkely United Sch. Dist.*, 2004 WL 2075447, *2 n.6 (N.D. Cal. 2004) ("The Court may properly examine this extra-pleading material because . . . Plaintiff asserts discrimination and retaliation claims under Title VII . . . and the District has challenged the Court's subject matter jurisdiction over this claim. . . .  For motions to dismiss under Rule 12(b)(1), unlike a motion under Rule 12(b)(6), the moving party may submit affidavits or any other evidence properly before the court.") (cleaned up).  However, in 2019, the Supreme Court overruled the Ninth Circuit's treatment of "Title VII's charge-filing requirement [as] jurisdictional" and concluded that "Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts." *Fort Bend Cty., Tex. v. Davis*, 587 U.S. 541, 547, 551 (2019).  As a result, it is now crystal-clear that "[w]hether a plaintiff in a Title VII action has timely exhausted her administrative remedies is an affirmative defense, so the defendant bears the burden of pleading and proving it." *Kraus v. Presidio Trust Facilities Div./Residential Mgmt. Branch*, 572 F.3d 1039, 1046 n.7 (9th Cir. 2009) (cleaned up).

If a lack of administrative exhaustion is an affirmative defense that a Title VII defendant like Centurion bears the burden of pleading and proving, it is difficult to see how that defense is properly raised via a Rule 12(b)(6) motion to dismiss.  In other contexts in which a failure to exhaust administrative remedies is considered an affirmative defense, the Ninth Circuit has held that "such a defense should generally be raised on summary judgment.  A defendant may raise the defense under Rule 12(b)(6) [only] in the rare event that a failure to exhaust is clear on the face of the complaint."  *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 909 n.6 (9th Cir. 2020) (cleaned up) (applying this rule in an action under the Individuals with Disabilities Education Act).  *See also Albino v. Baca*, 747 F.3d 1162, 1168-70 (9th Cir. 2014) (en banc) (concluding that "an unenumerated motion under Rule 12(b) is not the appropriate procedural device for pretrial determination of whether administrative remedies have been exhausted under the [Prisoner Litigation Reform Act]" and that although "[i]n a few cases, a prisoner's failure to exhaust may be clear from the face of the complaint," "a motion for summary judgment, as opposed to an unenumerated Rule 12(b) motion," is usually the appropriate way "to decide exhaustion"); *Marcos v. U.S. Dep't of Navy*, 2023 WL 6283257, *2 (D. Haw. 2023) (applying these authorities when denying motion to dismiss Title VII claim for failure to exhaust administrative remedies).  Nor is this a "rare" case where "a failure to exhaust is clear on the face of the complaint." *McIntrye*, 976 F.3d at 909 n.6.  To the contrary, the FAC generally alleges that "[a]ll conditions precedent to the institution of this suit have been fulfilled and Plaintiff has satisfied all jurisdictional prerequisites to the maintenance of this action" (Doc. 13 ¶ 14) and then more specifically alleges that "Plaintiff timely filed a charge of discrimination with the EEOC regarding Centurion on or about October 28, 2021.  The EEOC issued a Notice of Right to Sue on September 20, 2023, and Plaintiff's filed this First Amended Complaint within ninety (90) days of receipt of said notice."  (*Id.* ¶ 18.)

Nevertheless, even assuming a more searching factual inquiry into the question of exhaustion might be warranted at this stage of the case, Centurion is not entitled to dismissal.  "Under Title VII, a plaintiff must exhaust her administrative remedies by filing

a timely charge with the EEOC . . . , thereby affording the agency an opportunity to investigate the charge." *B.K.B.*, 276 F.3d at 1099 (citation omitted). "The . . . scope of a Title VII claimant's court action depends upon the scope of both the EEOC charge and the EEOC investigation." *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990). *See also Vasquez v. Kiewit Infrastructure West, Co.*, 2020 WL 2842671, *5 (D. Haw. 2020) ("The Ninth Circuit Court of Appeals has adopted an expansive policy that allows for a finding of exhaustion as to all allegations of discrimination that either fell within the scope of the EEOC's actual investigation or an EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. . . . The inquiry is broad in scope and requires a determination of: (1) whether the agency actually did investigate the type of claim that is deficient on the face of the charge of discrimination; or (2) whether the agency should have investigated the type of claim that is deficient in the charge of discrimination.") (cleaned up).

Although the charge of discrimination that Plaintiff filed with the EEOC on October 25, 2021, did not include any factual allegations related to Plaintiff's resignation (Doc. 36-1 at 87-96)—which was an understandable omission at the time, given that Plaintiff did not resign until the following month (Doc. 13 ¶ 117)—this omission does not preclude Plaintiff from establishing exhaustion related to her alleged constructive discharge. As noted above, "[t]he exhaustion analysis . . . doesn't stop with the EEOC charge form. The Court also must assess whether the current charges fall within the scope of the EEOC's actual investigation or an investigation which can reasonably be expected to grow out of the charge." *Petty v. Circle K Stores Inc.*, 2020 WL 1236343, *11 (D. Ariz. 2020) (cleaned up).

In an attempt to establish the scope of the EEOC's actual investigation, Plaintiff has submitted various documents that were generated during the administrative process. (Doc. 39-1.) Centurion doesn't dispute the authenticity of those documents but contends they cannot be considered at this stage of the case because they are not attached to the FAC or incorporated by reference in the FAC. (Doc. 40 at 10.)

An initial difficulty with this objection is that it presumes that a motion to dismiss for failure to exhaust administrative remedies is a run-of-the-mill Rule 12(b)(6) defense as to which judicial review should be limited to the face of the complaint, any documents attached to or incorporated by reference in the complaint, and any matter subject to judicial notice.  But as discussed above, the affirmative defense of failure to exhaust administrative remedies should ordinarily be raised via a motion for summary judgment and is cognizable at the pleading stage only "in the rare event that a failure to exhaust is clear on the face of the complaint." *McIntyre,* 976 F.3d at 909 n.6.  It is thus not clear that Plaintiff needs to present *any* evidence at all at this stage of the case—much less that Plaintiff can only submit the limited categories of evidence that are ordinarily cognizable at the Rule 12(b)(6) stage.  *See, e.g., McCormick v. Union Pacific Corp.*, 2019 WL 13292980, *2-3 (W.D. La. 2019) ("Union Pacific has not established from the face of the pleadings . . . that Plaintiff failed to exhaust his administrative remedies with respect to either of the two new theories of relief.  Plaintiff does not have to anticipate a defendant's affirmative defense, assemble all documents potentially relevant to the defense, and make them exhibits to his complaint (or amended complaint) in order to file it.  If Union Pacific wishes to assert an affirmative defense of failure to exhaust administrative remedies, it should file a motion for summary judgment at the appropriate time and present its relevant evidence (or point to an alleged lack of evidence on an issue) and challenge Plaintiff to present competing evidence and create a genuine dispute of material fact.  It is premature to engage in that contest at this time.")  As a result, some courts have concluded that when, as here, a plaintiff seeks to avoid an exhaustion-based motion to dismiss by submitting documents intended to establish the scope of the EEOC's actual investigation, the proper approach is simply to deny the motion to dismiss.  *Vasquez*, 2020 WL 2842671 at *5-6 ("Plaintiff has submitted documents related to the EEOC investigation of her disability discrimination claims. . . . These documents raise questions surrounding the EEOC's investigation . . . [but] [t]he Court is unable to conduct a factual inquiry pursuant to Fed. R. Civ. P. 12(b)(6).  Plaintiff pled that she complied with the administrative exhaustion requirements before filing suit

1    and . . . [t]he inquiry about administrative exhaustion requires a detailed examination of

2    fact . . . [that] is not suitable for review in a 12(b)(6) motion.") (citations omitted).

3           At any rate, at least one of the documents attached to Plaintiff's response—the

4    position statement that Centurion submitted to the EEOC in November 2022 (Doc. 39-1 at

5    5-9)—may be considered at the Rule 12(b)(6) stage because it is subject to judicial notice

6    and Centurion does not dispute its authenticity.  *See, e.g.*, *Smith v. Westchester County*,

7    769 F. Supp. 2d 448, 461 n.12 (S.D.N.Y. 2011) ("[D]ocuments filed with the EEOC . . .

8    are records of administrative proceedings which may properly be relied upon in connection

9    with the Court's review of a motion to dismiss.  Accordingly, the Court may also take

10   judicial notice of . . . Westchester County's position statement submitted to the EEOC . . .

11   on April 4, 2008.") (citations omitted); *Overstreet v. Living Spaces Furniture LLC*, 2023

12   WL 4408269, *3 (D. Ariz. 2023) (noting that, under Ninth Circuit law, "[j]udicial notice

13   is appropriate for records and reports of administrative bodies" and that "[d]istrict courts

14   in the Ninth Circuit routinely take judicial notice of portions of documents from the

15   EEOC") (citations omitted).  The stated purpose of the position statement was to "aid[] the

16   Commission in its investigation and facilitating the informal resolution of this matter."  (*Id.*

17   at 5 n.3.)  In the position statement, Centurion argued:

18           As an initial matter, to the extent Charging Party's intent was to assert either
19           a sex or disability discrimination claim based on a tangible employment
             action theory, such claim must fail because Charging Party suffered no
20           adverse employment action.  Although Charging Party claims she was
             demoted from her Director of Nursing position at Phoenix, this is not true.
21           Charging Party remained in that position until her voluntary resignation.  The
             record here is quite the opposite of a record suggestive of discriminatory
22           intent.  [Centurion] promoted Charging Party multiple times throughout her
             employment, including the last time into a Director of Nursing Position after
23           she had written a letter demoting herself from her Assistant Director of
24           Nursing Position.  ***Further, to the extent Charging Party would attempt to
             repackage her voluntary resignation as a constructive discharge, such
25           attempt fails.  As shown below, Charging Party cannot meet the standard
             for a hostile work environment claim, much less the more rigorous
26           standard for a constructive discharge***.  Any claim of discrimination based
27           on a tangible employment action theory must therefore fail.

28

(*Id.* at 8, emphasis added.)

Centurion contends this document is irrelevant for exhaustion purposes because it "at best suggest[]s that the EEOC was somehow aware of her resignation, not that she was compelled to resign based on objectively intolerable working conditions." (Doc. 40 at 10.) This argument is unpersuasive. Although the record is less than fully developed as to why Centurion chose to attempt to persuade the EEOC that Plaintiff "cannot meet . . . the more rigorous standard for a constructive discharge" (Doc. 39-1 at 8), the inclusion of this argument in Centurion's position statement raises at least an inference that EEOC's investigation ultimately expanded beyond the issues raised in Plaintiff's formal charge to encompass the question of constructive discharge.

In *Hinson v. Hyundai Motor Mfg. Ala., LLC*, 2024 WL 476885 (M.D. Ala. 2024), the court encountered a similar situation. There, an employer argued that the plaintiff's "failure to amend her EEOC complaint or file a new complaint with the EEOC following her discharge . . . forecloses her ability to raise her unlawful termination count" but the district court disagreed, concluding that because the employer "presented arguments regarding [the plaintiff's] termination in its response to the EEOC complaint," this "clearly indicate[d] that [the] termination was part of the EEOC's investigation, and that [the employer] understood it to be." *Id.* at *8. Similarly, in *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437 (5th Cir. 2017), the Fifth Circuit concluded that the plaintiff properly exhausted his failure-to-accommodate claim, even though it was not mentioned in his formal EEOC charge, in part because the employer later submitted a position statement to the EEOC "stat[ing] that '[plaintiff] never made any request for reasonable accommodation from [employer]'" and "respond[ing] to a question—presumably posed by the EEOC—about [plaintiff's] request for a reasonable accommodation." *Id.* at 443-44. Given this backdrop, the court concluded that "the EEOC investigation clearly encompassed [plaintiff's] failure to accommodate claim." *Id.* at 443.[7]

---

[7] Other courts have also concluded that references to a particular issue in an employer's position statement to the EEOC can serve as proof that the EEOC's investigation ultimately encompassed that issue. *See, e.g.*, *Mayes v. EnPro Associates, LLC*, 2022 WL 16040878, *6 (N.D. Ga. 2022) ("[G]iven Plaintiff's listing of Stemco as

The Court does not foreclose the possibility that the EEOC may have declined to expand the scope of its investigation to include the constructive-discharge issue raised in Centurion's position statement.  As noted, the record is less than fully developed as to what occurred during the administrative proceedings.  But the bottom line is that even assuming Centurion can challenge administrative exhaustion at this stage of the case, Plaintiff has done enough, at least for now, to avoid dismissal for failure to exhaust.[8]

## V.     Failure To State A Claim Under The ADA

### A.     **The Parties' Arguments**

As noted, the FAC asserts three claims arising under the ADA.  Count Three is an ADA claim for "Disability Discrimination; Failure to Accommodate."  (Doc. 13 ¶¶ 162-67.)  Count Four is an ADA claim for hostile work environment.  (*Id.* ¶¶ 168-75.)  Count Five is an ADA claim for retaliation.  (*Id.* ¶¶ 176-85.)

---

her employer in her charge, and the references to EnPro in Stemco's Position Statement, the scope of the EEOC's investigation into her allegations of discrimination and retaliation reasonably would have grown to encompass EnPro as Stemco's corporate parent."); *Reese v. Northwest Bank*, 2021 WL 2720837, *5 (W.D. Pa. 2021) ("During the investigation, Northwest Bank submitted a position statement that discussed in detail the events that occurred at the August 1 meeting.  The position statement states that both McAndrew and Bender contacted Human Resources after the meeting and thereafter each prepared a short written statement about what occurred at the meeting.  Thus, Moving Defendants' actions related to the August 1 meeting were fairly within the scope of the investigation to satisfy the exhaustion requirement.") (cleaned up).  *See also Chaplin v. HCL Am., Inc.*, 2023 WL 8606789, *2-3 (N.D. Tex. 2023) ("Looking to the initial charge alone, no amount of liberal construction can manufacture a cognizable Title VII claim. . . .  But this Court has long recognized that judicial inquiry isn't constrained to the four corners of an EEOC charge . . . [and] things change when the Court looks beyond the initial charge to the Parties' position statements—filings each submitted to agency investigators. . . .  It requires little interpretive breadth to imagine an investigation into [the claims in the position statements] would implicate Title VII.  Because these and other examples from Chaplin's position statement gave fair notice of his Title VII grievances, the Court must DENY summary judgment [as to exhaustion] on Chaplin's claims for retaliation and hostile work environment.").

[8]     This conclusion obviates the need to resolve Plaintiff's alternative argument for why she should be deemed to have exhausted her constructive discharge claim despite failing to mention it in her formal EEOC charge, which is that it was "like or reasonably related to the allegations contained in the EEOC charge."  *Green*, 883 F.2d at 1475-76 (cleaned up).  The Court also declines to resolve Centurion's claim, raised for the first time in its reply, that Plaintiff was required to "plead constructive discharge as a separate claim" rather than "as part of her retaliation claims."  (Doc. 40 at 10.)  This argument was not fairly raised in Centurion's motion, which only challenged exhaustion, and "[t]he district court need not consider arguments raised for the first time in a reply brief."  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

Centurion argues that all three ADA claims should be dismissed under Rule 12(b)(6) for failure to state a claim.  (Doc. 36 at 10-13.)  As for Count Three, Centurion argues that Plaintiff's allegations are conclusory because Plaintiff "does not identify any accommodation she requested or that Centurion failed to provide her" and acknowledges that Centurion "allowed [her] to take multiple leaves of absence."  (*Id.* at 11.)  Centurion further argues that to the extent Plaintiff expressed concerns about understaffing, those claims "are not actionable" because they "were unrelated to her disability" and Centurion was not required "to hire additional employees as an accommodation."  (*Id.*)  As for Count Four, Centurion argues that "the Ninth Circuit has not recognized a hostile work environment claim under the ADA" and, at any rate, Plaintiff fails to allege that the harassment she experienced was based on her underlying disability: "Although Plaintiff alleges she has depression, anxiety, and PTSD, . . . Plaintiff attributes all the alleged harassment to her sex, reporting sexual assault, and filing *Fox I*."  (*Id.* at 11-12, citation omitted.)  As for Count Five, Centurion asserts that "none of the alleged conduct Plaintiff complained of"—which consisted of (1) "reporting the sexual assault," (2) "filing *Fox I*," and (3) "complaining about harassment based on such reports"—"was prohibited by the ADA, meaning she did not engage in protected activity under that statute."  (*Id.* at 13.)

In response, Plaintiff defends the sufficiency of all three ADA claims.  (Doc. 39 at 14-17.)  As for Count Three, Plaintiff contends that because the FAC alleges that Centurion was aware of her disability, Centurion "ha[d] a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations."  (*Id.* at 14-15.)  Plaintiff also seems to argue that Centurion discriminated against her by assigning certain "punitive" tasks to her, demoting her, and posting her job.  (*Id.* at 15.)  As for Count Four, Plaintiff argues that it states an ADA hostile work environment claim because the FAC identifies numerous instances of disability-based harassment, including an episode "where three co-workers maliciously spread Plaintiff's personal information across the complex and to the nursing board," and also alleges that "[she] perceived the harassment as being in retaliation for her participation

in the lawsuit . . . as well as because of her history of depression, anxiety, and PTSD." (*Id.* at 15-16, cleaned up.)  As for Count Five, Plaintiff argues that it states a claim for ADA retaliation because "[t]he FAC describes protected activity in that Plaintiff reported the harassment of her co-workers which was based, at least in part, on her disability" and this report gave rise to "increasingly severe harassment." (*Id*. at 16-17).

In reply, as for Count Three, Centurion asserts that "[t]here exists no stand-alone claim for failing to engage in the interactive process." (Doc. 40 at 11, citation omitted.) According to Centurion, an employee "must allege and show the existence of a specific reasonable accommodation that was available but which the employer did not pursue." (*Id.*)  As for Count Four, Centurion reiterates that Plaintiff's allegations are conclusory and contends that the alleged episode in which co-workers circulated Plaintiff's personal information "has no connection with her alleged disability." (*Id*. at 11-12.)  As for Count Five, Centurion argues that Plaintiff's retaliation claim is not based on ADA-related protected activity because "it is clear that Plaintiff believes she 'engaged in protected activity by reporting the sexual harassment and assault by McClelland' and filing *Fox I*." (*Id.* at 12.)

## B. **Analysis**

### 1.   Count Three

Plaintiff styles Count Three as a claim for "Disability Discrimination; Failure to Accommodate" in violation of the ADA.  (Doc. 13 ¶¶ 162-67.)  Paragraph 165 of the FAC seems to suggest that this claim is based both on "discriminating against Plaintiff on the basis of her actual and/or perceived disabilities and/or record of impairment, *and* failing to provide reasonable accommodation or engage in an interactive process," which constitute separate "*violations* of the [ADA]." (*Id.*, emphases added.)  Likewise, in her response brief, Plaintiff argues that Count Three is "more than sufficient to state a claim under the ADA for disability discrimination *and* failure to accommodate" and seems to articulate separate theories of liability as to each type of claim.  (Doc. 39 at 14-15, emphasis added.) Despite this, Centurion focuses all of its arguments on the sufficiency of the allegations

underlying Plaintiff's reasonable-accommodation theory.

On the one hand, Centurion is correct that those allegations fail to state a claim under Rule 12(b)(6). One way an employer may engage in unlawful discrimination in violation of the ADA is by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). *See also Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) ("The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business.").

"The Ninth Circuit has held that notifying an employer of a need for an accommodation triggers a duty to engage in an 'interactive process' through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee." *Snapp*, 889 F.3d at 1095. "The interactive process requires both the employer and the employee to engage in good faith in order to clarify what the individual needs and identify the appropriate accommodation." *Goos v. Shell Oil Co.*, 451 F. App'x 700, 702 (9th Cir. 2011) (cleaned up). "While the employer's participation is necessary because it has superior knowledge regarding the range of possible positions and can more easily perform analyses regarding the essential functions of each, the employee's participation is equally important because he or she generally knows more about his or her capabilities, and holds essential information for the assessment of the type of reasonable accommodation which would be most effective." *Id.* (cleaned up). Although "[t]he interactive process is at the heart of the ADA's process and essential to accomplishing its goals," "there exists no stand-alone claim for failing to engage in the interactive process. Rather, discrimination results from denying an available and

reasonable accommodation." *Snapp*, 889 F.3d at 1095, 1097 (citation omitted). *See also Chandler v. DeJoy*, 2024 WL 359469, *20 (D. Ariz. 2024) ("[T]he interactive process is a mechanism for *identifying* a reasonable accommodation—it is not, itself, *the* reasonable accommodation. When an employer fails to engage in the interactive process, this may make it easier for a plaintiff to prevail, but it does not eliminate the need to determine whether a reasonable accommodation was possible.").

To survive a motion to dismiss on a failure-to-accommodate claim, a plaintiff must allege that some reasonable accommodation existed that her employer failed to provide. *Federico v. DeJoy*, 2024 WL 1175755, *10 (D. Ariz. 2024). In *Frederico*, a former postal employee alleged that her employer failed to accommodate her because it was "Defendant's obligation to engage in a 'good faith interactive process' to identify a reasonable accommodation," but the plaintiff did not specify the nature of the required accommodation. *Id.* The court dismissed for failure to state a claim, explaining that "a plaintiff must show that a reasonable accommodation is possible." *Id.*

Here, too, Plaintiff has alleged that she had a disability (Doc 13 ¶¶ 112, 139, 163-164), that Centurion was aware of her disability (*id.* ¶¶ 112, 139); and that Centurion failed to engage in an interactive process (*id.* ¶¶ 135-139). However, as in *Frederico*, Plaintiff has not identified a reasonable accommodation that would have allowed her to do her job. Thus, Count Three fails to state a claim for failure to accommodate.

On the other hand, Count Three may not be limited to a failure-to-accommodate claim. As discussed, although the FAC and Plaintiff's response brief are not a model of clarity, Plaintiff also seems to be asserting a claim for disparate treatment in Count Three based on Centurion's decision to subject her to several adverse employment actions—including assigning certain "punitive" tasks to her, demoting her, and "posting" her job—after learning of her disability. (Doc. 39 at 15.) It is possible to pursue an ADA discrimination claim based on such allegations. *See, e.g.*, *Burris v. Safeway, Inc.*, 2006 WL 2731113, *4 (D. Ariz. 2006) ("[P]laintiff has established her prima facie case because she has produced the very little evidence necessary for a reasonable jury to infer that the

defendant demoted and transferred her at least in part because she was perceived by management personnel as no longer being able to be an effective manager due to her psychiatric condition."). *See also Fitzsimmons v. City of Phoenix*, 2008 WL 2225764, *3 (D. Ariz. 2008) ("The ADA not only prohibits employers from taking adverse actions against employees because of their disabilities, but also requires employers to reasonably accommodate disabled employees.").

With that said, and although Centurion does not specifically address the sufficiency of Plaintiff's disparate-treatment theory in its motion papers, Centurion's other arguments (as well as Plaintiff's responsive arguments) make clear that any such claim is also subject to dismissal under Rule 12(b)(6). "To set forth a prima facie disability discrimination claim, a plaintiff must establish that: (1) he is disabled within the meaning of the ADA; (2) he is qualified (i.e., able to perform the essential functions of the job with or without reasonable accommodation); and (3) the employer [subjected him to an adverse action] because of his disability." *Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 433 (9th Cir. 2018). As for the second element of qualification, Plaintiff does not contend that she could perform her job without a reasonable accommodation. To the contrary, the very premise of Plaintiff's failure-to-accommodate claim is that she needed a reasonable accommodation in order to perform. (Doc. 39 at 15 ["The FAC also alleges facts showing that Centurion was aware of the need for a reasonable accommodation."].) However, because the FAC fails to allege what that reasonable accommodation was—an omission that, as discussed, requires the dismissal of Plaintiff's failure-to-accommodate claim—it follows that the FAC also fails to plead sufficient facts to establish that Plaintiff was a qualified individual for purposes of any disparate-treatment claim. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 989 (9th Cir. 2007) ("If a disabled person cannot perform a job's essential functions (even with a reasonable accommodation), then the ADA's employment protections do not apply.") (cleaned up).

Accordingly, Count Three is dismissed.

…

- 40 -

2.    <u>Count Four</u>

Centurion's first ground for seeking the dismissal of Count Four—that the Ninth Circuit does not recognize hostile work environment claims under the ADA—is foreclosed by a recent decision that was issued after the briefing process concluded.  *Mattioda v. Nelson*, 98 F.4th 1164, 1174 (9th Cir. 2024) ("[W]e now join our sister circuits that have held that hostile-work-environment claims are cognizable under the ADA.").

On the merits, Plaintiff "must allege that [s]he was subjected to harassment because of h[er] disability, and that the harassing conduct was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment."  *Id.* (cleaned up).  Here, Centurion doesn't question the severity or pervasiveness of the alleged harassment.  Instead, Centurion's narrow dismissal argument is that the FAC fails to plausibly establish that the harassment was due to Plaintiff's disability (as opposed to her sex and her engagement in Title VII protected activity).  (Doc. 36 at 12.)

This argument is unavailing.  Most notably, the FAC alleges that three co-workers "ran a background check on Plaintiff and spread inaccurate information about her across the prison and to the Arizona State Board of Nursing, which put Plaintiff's nursing license in jeopardy" and that one of those co-workers "also found news articles about Plaintiff's sexual assault and circulated them amongst co-workers."  (Doc. 13 ¶¶ 122-23.)  The FAC also alleges that Plaintiff "perceived" this harassment as arising, in part, "because of her history of depression, anxiety, and PTSD."  (*Id.* ¶ 120.)  If the review were limited to the face of the FAC, the Court might agree with Centurion that there is an insufficient link between the complained-of incidents and Plaintiff's belief that those incidents were motivated by her disability.  However, the review is not so limited.  As discussed in earlier portions of this order, Plaintiff's formal charge of discrimination to the EEOC may be considered at this stage of the case because it is incorporated by reference in the FAC— indeed, Centurion is the party that proffered the charge for consideration.  The charge contains additional details regarding the incidents described in paragraphs 122 and 123 of the FAC, including that the materials circulated by the co-workers disclosed "that

[Plaintiff] had previously attempted suicide and was criminally charged after being pulled over while trying to drive [herself] to a hospital after the attempt" and that one of the co-workers "told other co-workers that [Plaintiff had] PTSD and was not suitable for the job." (Doc. 36-1 at 92.)  These additional details are sufficient to establish, at least at the pleading stage, that the complained-of acts of harassment were linked to Plaintiff's disability.  *Cf. Mattioda*, 98 F.4th at 1175-76 (concluding that the district court erred by finding that the complaint "failed to allege a plausible causal nexus between the claimed harassment and [the plaintiff's] disabilities" in part because one of the complained-of incidents involved a "threat to [the plaintiff's] job [that] was explicitly linked to his disabilities").

### 3.   Count Five

Under the ADA, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."   42 U.S.C. § 12203(a).   "To establish a prima facie case of retaliation under the ADA, an employee must show that: (1) he or she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two." *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004).

Centurion's narrow dismissal argument as to Count Five is that all of the protected activity alleged in the FAC consists of Plaintiff complaining about *sex*-related discrimination and retaliation, not *disability*-related discrimination and retaliation, and thus that conduct only qualifies as protected activity for purposes of her Title VII retaliation claim and not for purposes of her ADA retaliation claim.  (Doc. 36 at 13.)  This argument is unavailing in light of the conclusions reached above in relation to Claim Four.  As discussed, when the FAC and the EEOC charge are considered together, it is plausible that Plaintiff perceived the acts of harassment committed by her co-workers to be motivated at least in part by her disability.  The FAC specifically alleges that Plaintiff then "complained and reported the harassment."  (Doc. 13 ¶ 124.)  It follows that those complaints and reports

qualify as protected activity for purposes of an ADA retaliation claim. *Westendorf v. W. Coast Contractors of Nevada, Inc.*,712 F.3d 417, 422 (9th Cir. 2013) ("An employee engages in protected activity when she opposes an employment practice that either violates [the underlying statutory scheme] or that the employee reasonably believes violates that law."); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002) ("It is unnecessary that the employment practice actually be unlawful; opposition thereto is protected when it is based on a reasonable belief that the employer has engaged in an unlawful employment practice.") (cleaned up).

## VI.   Leave to Amend

The Court has now determined that Counts One and Three are subject to dismissal. Plaintiff specifically requests leave to amend as to Count One because she can "provide additional facts about the sexual harassment she experienced at ASPC-Phoenix and when it occurred." (Doc. 39 at 12.) Centurion contends this request "is disingenuous given [Plaintiff] declined to amend when [Centurion] pointed out the deficiency in her FAC." (Doc. 40 at 10.) As for Count Three, Plaintiff does not specifically explain why leave to amend should be granted but generally seeks leave to amend as to any count that is dismissed. (Doc. 39 at 17.) Centurion opposes this request because "[n]o amendments will change that Plaintiff's claims are barred by claim preclusion." (Doc. 40 at 12.)

These disputes are governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.* (citation omitted). Thus, Plaintiff's amendment requests should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). "An amendment is futile when 'no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense.'" *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) (citation omitted).

Applying these standards, Plaintiff's requests for leave to amend are granted. Centurion's main futility argument is based on the false premise that all of Plaintiff's claims are barred by the doctrine of claim preclusion.  Additionally, Plaintiff has only amended the complaint once to add additional parties.  (Doc. 12.)  Therefore, the policy of extreme liberality underlying Rule 15(a) counsels in favor of granting Plaintiff's amendment requests, as it appears at least theoretically possible that the deficiencies identified above can be cured based on the pleading of additional facts.

Accordingly,

**IT IS ORDERED** that Centurion's motion to dismiss (Doc. 36) is **granted in part and denied in part.**

**IT IS FURTHER ORDERED** that Plaintiff may file a Second Amended Complaint ("SAC") within 14 days of the issuance of this order.  If Plaintiff files a SAC, the changes shall be limited to attempting to cure the deficiencies raised in this order and Plaintiff shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.

Dated this 30th day of September, 2024.

Dominic W. Lanza
United States District Judge

- 44 -